FILED

NOV 10 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| GRANT OWENS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| vs. | § | Civil Action: 1:26-cv-02581 |
| | § | |
| | § | |
| U-HAUL CO. OF TEXAS, | § | **JURY DEMANDED** |
| | § | |
| *Defendant*. | § | |
| | § | |

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

TO THE HONORABLE COURT:

Plaintiff Grant Owens, appearing pro se, moves for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2), upon the Original Complaint, the Clerk's entry of default, sworn declarations, Defendant's Workday payroll records, and the exhibits submitted in support of the motion.

**PROCEDURAL HISTORY:**

1. Plaintiff commenced this action on September 18, 2026. The Original Complaint pleads three distinct claims: religious discrimination under Title VII (Count I, ¶¶ 57–65); retaliation under Title VII (Count II, ¶¶ 66–75); and intentional race discrimination under 42 U.S.C. § 1981 (Count III, ¶¶ 76–85).

2. Defendant was served with process on September 29, 2026. The response deadline expired October 20, 2026. Defendant has filed no answer, appearance, request for extension, motion, or other defense. Plaintiff has requested entry of default under Rule 55(a).

**WELL-PLEADED ALLEGATIONS SUPPORTING LIABILITY:**

3. Count I alleges that Human Resources demanded documentary proof of Plaintiff's sincerely held belief concerning Plaintiff's religious identity as a citizen or resident of the Kingdom of Heaven, rejected or disapproved of that belief, and treated Plaintiff adversely in processing employment records and related terms or conditions. Original Complaint ¶¶ 21–32, 57–65. Plaintiff does not assert that Title VII itself required a particular citizenship, tax, or employment-authorization classification. Original Complaint ¶ 62.

4. Count II alleges that Plaintiff opposed what Plaintiff reasonably and in good faith believed was unlawful religious discrimination; clarified the equal-employment-opportunity basis of the complaint to Plaintiff's supervisor on March 23, 2025; and suffered a demotion, reduction in hours and pay, and diminished opportunities on or about March 24, 2025. Original Complaint ¶¶ 33–44, 66–75. The Original Complaint expressly alleges but-for retaliation. Id. ¶ 74.

5. Count III alleges intentional unequal employment terms based on Plaintiff's Black race and ancestry. Defendant allegedly applied a $100,000 hitch-sales threshold to restrict Plaintiff despite $172,547 in sales at Plaintiff's location, while a white comparator at a location with $87,689 in hitch sales remained full-time and later received advancement. Original Complaint ¶¶ 45–56, 76–85. Plaintiff alleges the differential treatment would not have occurred but for Plaintiff's race. Id. ¶ 84.

**DAMAGES AND EVIDENCE:**

6. Before the March 24, 2025 adverse action, Plaintiff was assigned 40 hours weekly at $20 per hour; following that action, Plaintiff was assigned 22 hours weekly. Defendant's official Workday records support a modeled gross-wage differential of $21,909.82. Plaintiff also earned less than $1,000 from limited property-management work during the damages period. Plaintiff seeks the corresponding lost earnings, together with $25,000 for restricted advancement. Exhibits A, C and D.

7. Plaintiff was being considered for advancement to a CSS position. Mario emailed Plaintiff about observing the CSS duties, and Corey, the Texas State Manager, recommended Plaintiff for advancement. The opportunity carried increased compensation, a company vehicle, and a company cellphone. Defendant's demotion, reduction of Plaintiff's assigned hours, and continuing restrictions materially impaired that opportunity. Original Complaint paragraphs 42–43, 47–56 and 80–84; Exhibits A and C.

8. Plaintiff's monthly housing obligation was $1,191 in rent, or approximately $1,500 including electricity, water and internet. Plaintiff lacked stable housing from approximately May through July 2025 and slept on the floor of Plaintiff's aunt's empty, unfurnished house, which was being shown for rent. The resulting injuries included continuing knee, hip and back pain; interrupted sleep; persistent nightmares and fear of renewed homelessness; approximately 30 pounds of weight loss; difficulty with nutrition and grooming; and substantial hair loss. Plaintiff requests $425,000 for these injuries. Exhibits A, B and E.

**REQUEST FOR JUDGMENT ON THE WRITTEN RECORD:**

9. The amounts requested quantify the economic, nonpecuniary and punitive relief expressly demanded in the Original Complaint. Plaintiff requests judgment on the filed pleadings and written evidentiary record.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff requests default judgment on Counts I, II and III; $20,909.82 in lost wages after a $1,000 outside-earnings credit; $25,000 for lost advancement opportunity; $425,000 in compensatory damages for nonpecuniary injury; and $750,000 in punitive damages under section 1981, totaling $1,220,909.82, together with taxable costs, applicable interest, and other relief pleaded in the Original Complaint, without duplicative recovery. Plaintiff relies upon Exhibits A through E and Defendant's official Workday paystub statements.

Respectfully submitted,

/s/ Grant Owens
Grant Owens
Plaintiff Pro Se
1051 W. South St.
Leander, Texas 78641
(620) 474-2839

Date: 11/09/2026

## EXHIBIT A — DECLARATION OF GRANT T. OWENS

I, Grant Owens, declare as follows:

1. I am the Plaintiff in this action. The matters stated below are based on my personal knowledge and the attached employment records. I could testify competently to these matters.
2. I was employed by U-Haul Co. of Texas as a Hitch Professional. Before March 24, 2025, my assigned work schedule was 40 hours per week at a pay rate of $20 per hour. Following the reduction in my employment status and scheduled hours, my assigned schedule was reduced to 22 hours per week. The official Workday pay statements reflect the hours actually paid in each pay period, my gross pay, and applicable hourly pay rates, including the later $23 hourly rate.
3. On March 23, 2025, I expressly explained to my direct supervisor that my complaint concerned Human Resources' treatment of my religious beliefs and that I believed I was reporting an equal-employment-opportunity violation. On or about March 24, 2025, Defendant reduced my employment status, scheduled hours, and compensation. My assigned workweek changed from 40 hours to 22 hours, reducing my anticipated weekly gross wages at $20 per hour from $800 to $440, a reduction of $360 per week before adjustments for actual paid time.
4. The Workday pay statements submitted with this motion are Defendant's official payroll records and accurately report the hours and wages shown for the corresponding pay periods. The variation in actual paid hours across individual pay periods does not change the fact that my assigned schedule was reduced from 40 to 22 hours per week. Exhibits C

and D use the official Workday records for actual wages and the former full-time schedule as the basis for its comparison.

5. During the damages period, I sought and obtained limited work in property management as an effort to mitigate the earnings I lost after Defendant reduced my hours. My total earnings from that property-management work did not exceed $1,000 throughout the entire damages period. That work was limited and did not restore the income lost from Defendant's reduction in my scheduled hours and compensation. Those earnings are disclosed separately from the official U-Haul payroll figures and may be credited against the claimed wage loss in the amount actually established.

6. My monthly housing obligation was $1,191 in rent, plus electricity, water, and internet, totaling approximately $1,500 per month. Following the reduction of my work schedule and income, I was unable to maintain that housing obligation. From approximately May through July 2025, I had no stable residence. During that period, I slept on the floor of my aunt's completely empty, unfurnished house, which was being shown to prospective renters. I had no bed or ordinary household furnishings there. These were the living circumstances I endured after losing the income necessary to sustain my housing.

7. Sleeping on the hard floor during approximately May through July 2025 left my knees, back, and hips sore and painful, and I still experience physical discomfort that began during that period. I was constantly worried that someone would discover me sleeping inside my aunt's vacant house while it was being shown for rent. I became jumpy at night and did not feel safe enough to sleep deeply. My sleep was interrupted for months. Even after I obtained housing, I continued to experience uneasy, interrupted sleep and nightmares about being homeless. I remain fearful of losing my present housing and

having to endure homelessness again. Without reliable access to a regular kitchen, I could not maintain my usual diet and lost approximately 30 pounds during the months without stable housing. I also lacked the conditions needed to maintain my normal personal grooming. I experienced extensive hair loss during this period of severe stress, and I am now bald. These physical and emotional effects have persisted beyond the period of homelessness and continue to affect my sense of safety, sleep, and daily life.

8. I was being considered for advancement to a CSS position. Mario contacted me by email regarding an opportunity to observe the duties of that position, and Corey, the Texas State Manager, recommended me for advancement. The opportunity included increased compensation, a company vehicle, and a company cellphone. Defendant's subsequent demotion of me, reduction of my assigned working hours from 40 to 22 per week, and continued restriction of my employment opportunities materially disadvantaged me in pursuing that advancement. These restrictions occurred despite my demonstrated performance and my location's hitch-sales revenue exceeding Defendant's stated $100,000 staffing benchmark.

9. I seek damages solely for the injuries arising from the conduct alleged in my Original Complaint. I do not seek separate damages here for a promised raise or for conduct occurring only upon the end of my employment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on November 9th, 2026

Grant Owens

## EXHIBIT B — DECLARATION OF CORROBORATING WITNESS

I, Joshua M. Staudt, declare as follows:

1. I am over eighteen years of age, competent to make this declaration, and have personal knowledge of the matters described here. I am Grant Owens's friend and roommate. I have remained closely involved in Plaintiff's life throughout the events giving rise to this action, including the loss of stable housing in 2025, and I continue to see the consequences in our shared home.
2. I witnessed the deterioration in Grant's financial and housing circumstances following the reduction in his U-Haul working hours and income. His former housing obligation was approximately $1,500 each month, including $1,191 in rent and utilities. From approximately May through July 2025, Grant lacked stable housing. During that period, he relied on his aunt's empty, unfurnished property, which was being shown to prospective renters, and slept on its hard floor instead of in an ordinary furnished residence.
3. Throughout this period I witnessed a marked deterioration in Grant's living conditions and physical appearance. He did not have a regular kitchen available to sustain ordinary meals or the normal facilities and stability needed for daily grooming. I saw the changes in his weight and hair during and following this period. Grant reported losing approximately 30 pounds over those months and losing most of his hair; the visible changes in his appearance were apparent to me.
4. Grant described pain in his knees, back, and hips from sleeping on the floor, together with fear of being discovered in the vacant property. I observed the physical discomfort

and exhaustion associated with his experience. I distinguish his descriptions of pain and fear from the changes in condition, behavior, and appearance that I witnessed myself.

5. As Grant's friend, I opened my home to ease his housing burden. As we share a home now, I continue to observe the consequences of that situation even after he regained stable housing. I have seen his apprehension concerning the security of his housing and the unease that continues to affect his daily life. I have observed ongoing disturbance of his rest and the effect that poor sleep has on his condition and behavior. Grant has told me about recurring nightmares of homelessness and fear of again losing his residence. These are continuing concerns, not merely events confined to May through July 2025.

6. My account is based on the close, continuing personal contact I have had with Grant as his friend and roommate, what I observed about his circumstances and behavior, and, where expressly identified, what he told me about experiences such as pain and nightmares. I make this declaration to describe the seriousness, duration, and continuing effects of the hardship I have witnessed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 09, 2026

Joshua M. Staudt

## EXHIBIT C — ECONOMIC DAMAGES AND ADVANCEMENT

Submitted in support of Plaintiff's Motion for Default Judgment. Original Complaint ¶¶ 42–43, 47–56, 73, 80–84 and Prayer ¶ 4.

### I. WAGE-LOSS METHOD

1. Defendant's official Workday pay statements establish the hours actually paid, hourly rates, gross earnings, and applicable pay periods. Before March 24, 2025, Plaintiff's assigned schedule was 40 hours per week at $20 per hour; following the adverse action it was reduced to 22 scheduled hours per week. Plaintiff compares a 40-hour weekly baseline at $20 per hour with wages shown in Defendant's official Workday records. The differing paid hours from period to period are actual payroll facts, not discrepancies in the underlying records.
2. For the complete biweekly pay periods March 31, 2025–August 16, 2026, plus the final nine days, the modeled counterfactual earnings are $58,628.57; actual gross earnings on the principal pay statements are $36,673.75; the provisional supplemental offset is $45.00; and the resulting modeled wage difference is $21,909.82.
3. The computation excludes March 24–30, 2025 because the relevant pay period spans the change in assigned hours. It uses the pre-demotion $20 rate as a conservative baseline despite Defendant's later official $23 rate. The $21,909.82 calculation concerns Defendant-paid wages; it does not include the separate, disclosed property-management income of no more than $1,000. Plaintiff requests that any credit for those separate earnings be based upon their amount actually established, without disturbing the authenticity or accuracy of the Workday records.

### II. ADVANCEMENT LOSS

4. The Original Complaint alleges that Plaintiff's location generated $172,547 in hitch sales, above the stated $100,000 benchmark, while comparator location 756032 generated $87,689; a white Hitch Professional at the comparator location remained full-time and was later promoted to Traffic Manager. Original Complaint ¶¶ 46–56, 80–84. Plaintiff was also considered for a CSS position. Mario contacted Plaintiff by email regarding an opportunity to observe its duties, and Corey, Defendant's Texas State Manager, recommended Plaintiff. The opportunity included increased compensation, a company vehicle, and a company cellphone. Defendant's demotion, reduction of Plaintiff's assigned schedule from 40 to 22 hours per week, and continued employment restrictions materially disadvantaged Plaintiff in pursuing this advancement. These facts particularize the pleaded restricted-advancement injury; the Original Complaint did not separately name the CSS position.

5. Plaintiff requests $25,000 for the advancement opportunity described above, based on the management communications, available benefits and the employment restrictions alleged in the Original Complaint.

## III. ECONOMIC DAMAGES REQUESTED

6. The full-time baseline for the modeled period is $58,628.57 at $20 per hour. Defendant's Workday statements reflect $36,673.75 in gross earnings for the included pay periods and an additional $45 supplemental payment. The resulting wage differential is $21,909.82. Plaintiff credits $1,000 for outside property-management work, yielding $20,909.82 in requested lost wages. With $25,000 requested for the lost advancement opportunity, the combined economic-damages demand is $45,909.82.

## EXHIBIT D — WORKDAY PAYROLL RECONCILIATION

1. Source: Grant Owens's U-Haul Co. of Texas Workday pay statements, checks dated August 8, 2024 through August 26, 2026 (57 pages).
2. The source statements document Plaintiff's position, wage rates, regular paid hours, certain supplemental payments, and gross earnings. Workday shows a $20 rate during 2025 and a $23 rate in June 2026 and thereafter.
3. For the modeled period March 31, 2025, through August 25, 2026, the 40-hour weekly baseline at $20 per hour yields $58,628.57. Defendant's official Workday statements show $36,673.75 gross earnings for the included principal pay periods; a separate $45 supplementary payroll payment is credited. The resulting $21,909.82 is the gross employer-payroll differential before a credit for separate property-management income of no more than $1,000.
4. The model excludes the initial March 24–30 transition week and does not separately claim the previously discussed but unimplemented raise (Original Complaint paragraph 49). The official Workday records are used as issued; no inconsistency is alleged. The former assigned 40-hour schedule and subsequent assigned 22-hour schedule provide the work-hours comparison. Plaintiff's property-management earnings are separately disclosed for an appropriate credit once their exact amount is substantiated.

## EXHIBIT E — STATEMENT OF NONPECUNIARY AND PUNITIVE DAMAGES

### I. NONPECUNIARY INJURIES

1. Original Complaint paragraph 43 alleges that Defendant's adverse employment action caused housing instability and emotional injury. Plaintiff's monthly housing obligation was approximately $1,500, including $1,191 rent plus utilities and internet. After the reduction in assigned hours from 40 to 22 per week, Plaintiff lacked stable housing from approximately May through July 2025.
2. During that period, Plaintiff slept on the floor of Plaintiff's aunt's vacant, unfurnished house while it was being shown for rent. Plaintiff experienced painful knees, back and hips; fear of discovery, shallow and interrupted sleep, and continuing nightmares and fear of losing housing; inability to maintain a regular diet and normal grooming; approximately 30 pounds of weight loss; and extensive hair loss. Plaintiff reports that the physical discomfort, sleep disruption and fear have continued.
3. Plaintiff requests $425,000 in compensatory damages for the physical discomfort, loss of personal security, emotional distress, and continuing nonpecuniary consequences described in Plaintiff's sworn declaration.

### II. PUNITIVE DAMAGES

4. The Original Complaint alleges that Defendant applied stated staffing and advancement criteria unequally to Plaintiff based on Black race and ancestry, despite Plaintiff's superior hitch-sales performance. Original Complaint paragraphs 45–56 and 76–85. Plaintiff requests $750,000 in punitive damages under 42 U.S.C. § 1981 for the pleaded intentional discrimination and managerial conduct.

5. Plaintiff requests one nonduplicative recovery on the causes of action pleaded. Plaintiff's primary damages request totals $1,220,909.82: $20,909.82 in net lost earnings, $25,000 in advancement damages, $425,000 in nonpecuniary damages, and $750,000 in punitive damages.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| GRANT OWENS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| vs. | § | Civil Action: 1:26-cv-02581 |
| | § | |
| | § | |
| U-HAUL CO. OF TEXAS, | § | **JURY DEMANDED** |
| | § | |
| *Defendant*. | § | |
| | § | |

**PROPOSED FINAL DEFAULT JUDGMENT**

The Court has considered Plaintiff's Motion for Default Judgment, the Original Complaint, the entry of default, and the evidence submitted.

1. Plaintiff's Motion for Default Judgment is GRANTED. Judgment is entered for GRANT OWENS against U-HAUL CO. OF TEXAS on Counts I, II and III of the Original Complaint.

2. Plaintiff is awarded $20,909.82 for lost earnings after a $1,000 credit for property-management earnings; $25,000.00 for lost advancement opportunity; $425,000.00 in compensatory damages for nonpecuniary injury; and $750,000.00 in punitive damages under 42 U.S.C. § 1981. The total monetary judgment is $1,220,909.82.

3. Plaintiff shall recover taxable costs as allowed by law. The judgment shall bear post-judgment interest pursuant to 28 U.S.C. § 1961 until paid. No duplicative damages are awarded.

4. This is a final judgment resolving all claims against Defendant in this action.

SIGNED: _______________, 2026, at Austin, Texas.

______________________________________

Judge Presiding

UNITED STATES DISTRICT JUDGE